Good morning, Your Honors. I'm Zach Wasserman, representing RUI-1, the appellant in this case. With me at the Council table are my partner, Robin Dunaway, and Carol Miller, General Counsel for RUI. This case is before the court de novo, and I know that you are familiar with the basic facts in the law. But I would like to touch briefly on a few points on each major issue before you. I do want to reserve time for rebuttal. I think in this case it is important to step back for a moment and look at the nature of living wage ordinances, which are often thought about like minimum wage laws but are really very different. In all of the hundred or so cities that have adopted living wage ordinances, they are a contractual requirement that those doing business with a particular city pay a wage, typically more than twice the federal minimum wage, often pay other benefits as part of the cost of doing business with the city that is reflected in the price that the city agrees to pay for the goods or services or the rent they receive from tenants or licensees. It is also, I think, important to keep in mind the context in which the City of Berkeley adopted the amendment to the living wage ordinance, which is before this Court today. In June of 2000, after more than eight months of study, the Berkeley adopted the standard living wage ordinance applying to contracts, largely drafted by representatives of the union, that applied only prospectively to certain businesses that would enter into contracts or contract amendments with the city after the date of the ordinance. Four months later, while the union was engaged in a major organizing effort of a hotel in the Berkeley marina, the city adopted the union drafted amendment applying the requirements of the ordinance unilaterally and immediately to the businesses in the specially created marina zone. Don't most laws apply immediately and unilaterally? I mean, you say those words as if there's something really bad about them, but isn't that how most ordinances apply? It is absolutely the way that most police power ordinances apply. The difference here is that the city stepped forward to amend a law based on contract and now applied it unilaterally. And I think that's the difference here, because what the city did was unilaterally change the contract. Counsel, does the original living wage ordinance, is it clear that it only applied prospectively to contracts that the city would enter into? Yes. And has it been applied retroactively to any contracts that the city had already entered into? Other than those in the marina zone under the amendment, no. Counsel, I have one other question on the original living wage ordinance. Why wasn't the marina included under the provision that said that it applied to lessees of public property, which was 13.27.30c? It was absolutely included, Your Honor. The tenants in the marina zone were covered under the original ordinance. However, because they already had an existing contract, it would only be applied to them in the future. Correct. When amendments came up or when their lease expired. Now, when you get somewhere along the line in this discussion, if you have become familiar with the recent decision in Fitzgerald v. The Racing Association of Central Iowa, the United States Supreme Court's recent equal protection case, it would be helpful if you could say whether you think that affects, you look like you don't know what it says. I do not, Your Honor. And if the Court does think that is important, I would like to address that in a second. In that case, the State of Iowa had a different rate of revenue that it got from riverboats gambling than from gambling on land, basically, and the Supreme Court said that was okay because the State had a rational reason to want to help riverboat communities. And it seemed as if that might affect your equal protection analysis. But since you haven't read the case. Well, the distinction that occurs to me, obviously with a caveat that I haven't read the case, is the only rationale here is that RUI occupied this land, valuable land, public trust land, undisputed, by lease with the city. The – and I apologize, Your Honor. You talked about the equal protection. Let me shift. The two, of course, are closely related in this matter because you keep coming back to the issue that the rationale for anything is that they occupied this valuable land. I think on the equal protection grounds, in that case, I would assume, based on the other similar cases, that there is some particular rationale in the difference, benefits or otherwise. Here, the only reason for singling out this district is that the people occupied this valuable – the businesses occupied this valuable land. Precisely what they had paid for in their lease. And that has no rational connection to the benefits sought by the amendment of increasing wages. Could the original ordinance have been divorced from contractual relationships and simply said, if anyone chooses to do business here, this is the wage that has to be paid? Just a flat-out police power ordinance. I know they didn't, but my question is, would there have been any constitutional problem with doing so, in your view? If they had done it citywide, there would have been no contract issue. It would have been a fewer police power. So if the original ordinance, instead of saying, henceforth, in your contract, you agree to this, had just said, henceforth, from next year, January 1 onward, everybody who employs people within the city of Berkeley has to pay this much, you'd have no constitutional argument at all, it sounds like. I think that's correct, Your Honor. I think that would be politically almost impossible for the city of Berkeley, but on constitutional grounds, had they done a minimum wage law by police power throughout the city, applying to all businesses equally, we would not have these issues. There might, if they included the 12 days of paid vacation, the National Labor Relations Act issue. Well, I'm still having trouble with the first prong of the contract clause claim that you have, which is, what provision of your lease agreement is actually impaired, substantially or otherwise, by the Marina Amendment? I think in answering that question, you need to look at the rationale for the ordinance as well as for the amendment, as well as the contract. The rationale is, because you occupy this land, therefore, we can impose this on you. The right to occupy the land is the fundamental element of the lease. You pay rent in order to occupy this land. And the city of Berkeley made very clear that it knew this land was valuable, was public trust land, that they had invested a lot of money in it when they entered into the amendment to the lease, increasing the rent in 1996. Except that the rationale for the amendment doesn't add a provision to the lease, which I think is Judge Wardlaw's question. What in the lease guarantees or even gives you an expectation that you'll have a certain cost of doing business in terms of wages and benefits? Or a certain amount of profits. I don't think profits are here, and we have not argued that. I do think it is the burden, the additional costs. There's nothing in the lease that says that the minimum wage statewide or federally will not be increased, obviously. There's not even anything in the lease that says a citywide law on minimum wage would be improper. But here, what the city did was say, because you occupy this land that we have leased to you, for that reason alone, we are imposing this additional cost on you. And I would point out it's an additional cost that in the Greenwich report and in all the reports to the city council, the city expected to share. That is, in all the underlying findings and reports supporting the adoption of the living wage ordinance, as well as the amendment, there was the issue that the city expected to share in the costs that would be imposed. That's the kind of bargaining that is inherently part of the rent. Right. But what I was getting at is the rent that you're paying, isn't it a certain percentage of your gross profits? Correct. So you're saying – I mean, I guess the way I'm seeing your argument was that you have an expectation of a certain amount of profit from this lease. I apologize, Your Honor. I think you may have said gross profit. It's gross sales. Gross sales. Right. It's total sales. It's not profits. It's not profits. I apologize. Okay. But from the total sales and calculating the value of the lease to your client, you're expecting a certain amount of costs and a certain amount of profits from those sales, which are now being reduced by virtue of having to increase the wages. Yes. There's no question that when you enter into a rental negotiation to decide what's a fair rent and whether, in fact, you want to rent this property, the business engages in a whole range of calculations to say, will this be profitable? Can I operate a profitable business? That's inherent in the nature of the business and in renting property. This is an absolute gross on sales, so the profit issue does not come in. But the reason that Berkeley offered was not because there's something about these businesses or even about this area that affects wages, that where more low-paid employees are here. The rationale is solely because you're here. The very essence of the landlord-tenant relationship, the very essence of paying rent, is the right to quietly enjoy this land and not to have some additional burden put on solely because you are occupying this land. If there were, for example, a particular issue that arose in the marina zone that needed police powers to address a particular kind of pollution, a particular kind of ‑‑ I'm not sure what else. But ‑‑ What the city has said, at least, is there's a particular kind of public interest and a particular kind of limitation on the number of businesses and choices that members of the public have and so on and so forth. Those reasons are not enough to have an ordinance of any kind, it sounds like, that relates solely to the marina district unless it has to do with whether it's sinking or something? Well, or unless it has to do with a particular nature of the public trust land. All of the elements that the Berkeley City cites in its findings for the amendment, the special nature of this, are precisely the elements that they cited in saying you've got to pay more if you want to stay here. The letter from the Berkeley City attorney says that expressly. Her words are, the major ingredient in the value of skates is its location. It is wholly inappropriate for RUI to benefit monetarily from the transfer of an asset which belongs to the public. The city council may be prepared to consent to the assignment if the market value of this public asset is reflected in the rent. Having done that, having gotten the high end of market rent demonstrated by the city manager's letter, they then come back four years later and say they didn't raise your rent. All they did was raise your cost of doing business by requiring you to pay more to your employees. So I don't know what, I guess. Well, first of all, and I think that the Court needs to look at the contract clause issue here under the higher scrutiny standard, because the city is benefiting from this law. The city is avoiding a cost that it expected to pay, sharing in the cost of requiring the additional wages. So then under the level of higher scrutiny. The city would never be responsible for paying your employees' wages. Are you saying they're avoiding the cost of welfare in some way or something like this? No. What I'm saying is that if you look at the Greenwich report, the report makes clear that Berkeley, like every other city that adopted the living wage ordinance, expects to share in the cost of doubling or tripling the minimum wage by receiving, in this instance, less rent. In the normal instance, if Berkeley entered into a new lease under the living wage ordinance, not the amendment, the Greenwich report makes clear that they would be, Berkeley would expect, to have that additional cost that they are imposing for someone leasing that property reflected in the cost of the lease. And it's that rationale which comes right back and says, by imposing this unilaterally, we are avoiding that cost. We are avoiding a negotiation over the rent that would have occurred when they were covered naturally under the living wage ordinance itself. The connection is there in the benefit of the land, and now they're saying that's the charge for the rent. To benefit from the land, you need now to do these additional things. Just as in the amendment, they also added a grease trap requirement in 1996, the amendment to the lease in 1996. So those are the additional kinds of burdens that you apply in rent. Here, when you're applying this burden solely to these businesses who are there solely because they have paid you high end of market rent to occupy that space, that's when it affects the rent, the basic element, the right of quiet enjoyment. Because you occupy it. It's not because of other circumstances that are related to the increase in wages. There's no connection. There's no nexus between the increase in wages and this particular location. Your time has expired. We will restore a minute or so for rebuttal for you. We'll hear now from the city. Good morning, Your Honor. Good morning, Your Honors. My name is Manuela Albuquerque. I'm the city attorney representing the city of Berkeley, the defendants in the case, and the appellees here. As I'd like to first just respond to certain factual comments that counsel made when he commenced his argument. Could you speak a little bit louder, please? Sure. Is that better? Okay. I just need to move it closer. Sorry. Before I commence with some of the key legal points here, I think I just want to set the record straight on certain comments counsel made about the facts here. Perhaps even before that, the nature of the procedural posture of this case, which goes to the standard of review and how you read some of the facts. This was RUI's motion for summary judgment, and as Your Honors are aware, in such a motion all facts would be construed against RUI. That motion was denied. Because the material facts were not in dispute in any way, the parties stipulated that the court could go ahead and decide the issue on its merits and enter judgment against RUI. So, in effect, the court decided the case on stipulated facts. This is not a grant of summary judgment in the city's favor. And that becomes important because although we agree with RUI that legal issues, for instance, what principles would be applicable to the impairment of contracts or equal protection or unlawful delegation claim are reviewed de novo by this court, any inferences that the court drew from stipulated facts about, for instance, what was the nature of the bargain between the city and RUI, that, Your Honor, we believe must be reviewed for clear error. The Knickerbrocker case, that's in our opening brief, and actually a couple of the cases that even RUI cites makes that point. So, leaving that aside, I turn to the record as counsel described it. For instance, his first point was that the living wage ordinance is somehow distinct from the minimum wage ordinance because living wage ordinances are always applied by contract. That's incorrect. In this case, there is an amicus brief filed by the Brennan Center and several civil rights groups, and the amicus curiae goes through the history of wage and hour regulation over the last 100 years and point out that the term living wage is not designed to describe in any fashion the manner in which these obligations are imposed, but instead the fact that minimum wage, many studies have shown, are simply not enough to allow someone to live even at the subsistence level. So for that reason, the word living wage is designed to describe what is the minimum level of income that a worker needs in order to simply pay the rent and medical benefits and education. So this is simply a misnomer. It has nothing to do with the touchstone of regulation. It is simply a description of the fact that minimum wage is simply that. It's too little, and a living wage is the minimum you need to live. It has nothing to do with contractual points. Secondly, this question about the context, the second point counsel made was that we simply adopted a union draft of the ordinance. There's nothing in the record that indicates that. I wrote that ordinance, and I'm very well aware that no union drafted that. I drafted that. I don't even want to have to say that because that's not in the record before you, but I'm only saying that because there's nothing in the record that the union provided any draft of the city, and that's simply wrong. And, in fact, the ---- It doesn't really matter, does it? Right. That was going to be the next point. Thank you, Your Honor. I was going to point out that the union has explained in its briefs a very well-settled principle, which is you don't look at who lobbied for what or what the motivations are. The law is either valid on its face or it's not in the union context. But, counsel. Yes, Your Honor. One thing that does trouble me, and I guess this touches on both the State's reasons, legitimate reasons, the public justification under the contract clause analysis as well as rational basis under the Equal Protection Clause, which admittedly has been further diluted after the Fitzgerald case. But what rationales were new or different at all when you adopted the Marina Amendment than from the time when you renegotiated the terms of the lease? In other words, is when ---- We have to look at any rational basis. But if they're all the same reasons existing at both times, what justifies the new amendment imposing an additional burden? Well, Your Honor, we don't consider it to be any amendment to the lease, and that is what Judge Ilston said. And, in fact, one of the cases cited by ---- No, but it applies to the Equal Protection, too.  What rationale is there that's different from when you renegotiated the lease? Well, you know, one might say, for example, that poor people have always been poor, and yet for 200 years, 200 years ago, we didn't have minimum wage regulations. Nothing is new about poverty. Nothing is new about people suffering. The whole nature of regulation is for various public policy reasons, legislatures start adopting laws to, for instance, protect racial minorities or the ADA. What justifies the immediate imposition without further renegotiation of the contract on RUI? Well, Your Honor, I think that goes to the impairment of contract question rather than to the Equal Protection question. With respect to the equal ---- So maybe I'll do the impairment first, and I'll get to the Equal Protection. With respect to the impairment of contract question, Your Honor, the threshold question is, as you asked, counsel, what is ---- I realize that. So I'm saying let's assume we get over the threshold question. Okay, we get over that. What is the rationale? Okay. What is the rationale? It's different from when you renegotiate the lease. Well, Your Honor, there are inconceivable rationale that this Court can envision, can justify whether it's recited in the findings. For instance, if you have the city can make a distinction between the level of benefit that, say, someone doing short-term contract for the city gets when they walk in the door and say do prepare an environmental impact report, and their ability from a public policy point of view to absorb that kind of a new public policy regulation for the benefit of the public, than someone who has a guaranteed fixed cost over a 40-year period, especially in light of the fact that over this period of time since 1990, since the beginning of this lease, we spent in the last 20 years, it's in the record, $61 million in that area to the benefit of a very few businesses. And it's not just lessees, Your Honor. The only factual evidence in the record on who is governed is at excerpts of record 400 to 401. And that is a letter from the city to notifying various businesses in the marina zone. So you could have licensees of lessees who are doing business in the zone. It's not simply city lessees who are nothing in the face of the ordinance. It purports to regulate lessees. It purports to regulate every business operating in the zone over a certain threshold. How many businesses are operating in the zone, Counsel? Well, we believe that there were 14 potentially affected, and we sent letters in ER 400 to 401 to 14 businesses. Because this ordinance is set up with a private right of action, and we're not involved in the enforcement necessarily, there is no evidence in the record, and we didn't know who may be affected. There are lots of people who comply without any kind of action. So no one can really say. There are no facts before you that says it's one business or two businesses or that it's definitely not simply lessees. Hornblower Yachts, for instance, is in here and is not a lessee. How many contracts or leases did the city have with businesses in the marina? Well, Your Honor, there's nothing in the record on the total number, and I don't know that. But you sent these to 14 potential businesses. Did all of those businesses currently have contracts or leases with the city? So some of them could have been sort of transient businesses. Well, you see, Your Honor, there could be licensees of lessees or people who are doing business with the lessees on the premises that would be subject to this, but they're not our lessees, not the city's lessees. So for example, if you had somebody who had a license to sell hot dogs from a portable stand that could be towed by a car and was towed into the marina to sell hot dogs on the side of the road, then the living wage ordinance would apply to the... If it met the thresholds of the gross receipts and the number of employees. I want to go back to a question that I asked Mr. Wasserman. Did the original living wage ordinance apply retroactively, or did it only apply prospectively? Well, Your Honor, it's our position that the marina zone ordinance doesn't apply retroactively. It applies when it goes into effect, as I think Judge Raber was pointing out immediately. Under the living wage ordinance, the city had existing contracts with many different kinds of vendors. Did the living wage ordinance apply immediately to existing contracts between contractors and the city? No. So it only applied to future contracts. No, Your Honor, it applied to any amendment to existing contracts. I'm sorry, it applied to what? It applied to any amendment to existing contracts. Okay, but any time there was an amendment to an existing contract, or a contract had to be renegotiated or you negotiated a new contract, then the living wage ordinance had to be included as a provision of the contract. Your Honor, yes, and as Mr. Wasserman was suggesting, this meant some sort of prolonged negotiation and some kind of bargaining over this issue. That was not the case. If someone asked for a 30-day extension of time on the face of the ordinance, it triggered that the provision would be amended in to the ordinance. Let's suppose that I don't know what you have at City Hall, but let's suppose that at City Hall you had somebody running a cafeteria that had either a license or a contract with the city to operate a cafeteria in the basement. As of the time that the living wage ordinance was adopted, your contract, the city's contract with the cafeteria operator, was not amended to include or to impose a living wage ordinance against their employees. Is that right? That's correct. So the only persons then that were existing contracts were affected immediately was at the marina. Yes, that would be correct, Your Honor. Now, again, I think that Mr. Wasserman in his response has essentially already conceded a key point, which is if it's citywide, he says, no violation. Now, what in the contracts clause makes that distinction? It either impairs the contract or it doesn't, and then there's either a legitimate governmental purpose and the means, then you go through the test. Let me ask you, though, in terms of the equal protection arguments, what is required to justify an ordinance or law that has limited geographic scope, just as a general matter, and whatever that standard is, how have you met it? Well, Your Honor, it's an extremely deferential standard. One of the cases we cited was a case involving a tax imposed actually by the city of Berkeley in Oakland Raiders versus the city of Berkeley. We might have been the only city to have a fight with the Raiders and win. But anyway, a tax was imposed, and it only applied. It was a certain admissions tax that only applied to an event grossing a very large amount, and the only event it applied to was the Oakland Raiders, and there was deference in that case because once you're in a rational basis test, there's a huge amount of deference. Now, the test, I think, is set out in New Orleans versus Duke, and what we're dealing with is economic legislation. And with economic legislation, it's very, very deferential. This is what the court said, the U.S. Supreme Court in New Orleans versus Duke. Court defers to particular statutory discriminations, defers to particular statutory discriminations, presumes their constitutionality, requires only that they be rationally related to legitimate state interests. The distinctions don't have to be made with mathematical exactitude, may implement the policy step by step, and the judiciary is not to act as a super legislature. And with respect to wage regulation, the amicus brief, Your Honor, again points out that the way wage regulation was first adopted in 1930s, well, it must be 18-something, in Toledo was, oh, wait, this is 2003, I'm still in the last century, Your Honor, sorry. I think it was in 1903 or something like that, was by Toledo and some other city, was on workers of the city. And then even today, in I believe it's the state of Wisconsin, there is wage regulation is targeted particular kinds of workers. Sometimes it was only women and children. Sometimes it's only in certain geographical areas. Sometimes it's only certain industries. You know, we could have called it something other than the marina zone. We could have said anybody who is providing water-related recreation at the marina. And this type of focused regulation has been typical of the pattern of 100 years of wage regulation. Although we think of wage regulation as being national and statewide, which it is today, in many states it's still incremental in this fashion. So I think it's a very, very deferential standard. And what Mr. Wasserman's argument is that, well, we pay rent for the location, so ergo everything is subsumed within the rent. And, Your Honor, $120 million is not the city is not trying to reimburse themselves by rent from three or four or five or ten businesses for that. In one or two sentences, would you sum up what your view is of the rational basis that would support the geographic focus in this case on the marina district? The massive multimillion dollar outlays of public funds, much after any agreement was negotiated with these individuals, the very protective regulatory climate and decisions not to allow any other private businesses to function there, and the fact that the public there had very limited opportunities of what businesses it could fraternize, and the fact that they can absorb this because of the long-term fixed costs that they have otherwise. Counsel, your time's up. I just want to say something. You've given such a nice civil argument, and it's been very well done, but I just want to note that I think your brief, your arguments in your brief, were somewhat undercut by the ad hominem attacks in the brief, and I didn't expect such a civil and very fine argument, actually, from both sides, but from having read some of the personal attacks in the brief, and it really does hurt your argument. Your Honor, do you mean about the BMA lease? Well, there's several references, and I don't want to go into them. Well, I certainly don't approve of that, so it was inadvertent. I just wanted to note that it undercuts your argument. It doesn't help it. Thank you. Are there any other questions from the panel? Thank you for your presentation. Thank you, Your Honor. We'll restore a minute for rebuttal for you. There's no dispute that Berkeley owns all of the land in the marina zone, so anybody there is there by their permission in some way or another. The Raiders case was a type of business case, not a geographic case. The Duke case was a very special geographic area and, in fact, was truly a grandfather case, not a geographic case. The distinction was people who had been there for more than 10 years, I believe. Counsel, this may not be in the record, but I am curious as to the 14 potential businesses in the marina. Does that answer? I think there were five. Was it five leases? Five contracts? I believe that there are five. The only ---- Who else might be operating in the marina? The Radisson Hotel, who's clearly covered. His Lordship's Restaurant, who's clearly covered. It is my belief that the others, including a yacht club, a bait shop, those are the only ---- that's the five. That constitutes the five. I'm not sure of the others. The other two, besides the three, are probably under the threshold of the ordinance. A couple just other ---- They might not stay there if they're prosperous. I apologize. They might not stay underneath the threshold if they become prosperous. They certainly could grow in terms of employees and the $350,000 gross sales. They could, yes. But it's still a very small number. Other than those five, do you have any idea who else might be operating on a more transient basis, what licensees might be operating in the marina? I believe that there is a charter boat that is operating as a licensee of one of the lessees. I'm not aware of any other licensees in the area or transients. Two other very quick points. If you lease an office building from the city and the city then subsequently builds a park and then says, I am creating a zone of these two blocks, park and office building, and all property owners ---- I'm sorry, all operators, businesses operating, have to pay to support that park, they have now changed your rent. That's essentially what happened here. My last comment is on one issue we've not talked about at all, and I just don't want to leave it without a touch, and that is the improper delegation of police power. My comment on that is ---- That's not rebuttal. It wasn't discussed by your opponent. But it's not waived. But it's not waived. That's true, too. We don't consider any of the arguments that we didn't get to today waived by either party. So with that, we will submit this case. And the arguments of both sides were very helpful. We appreciate them. And with that, we'll stand adjourned for this session.
judges: Graber, Wardlaw, Bybee